**KRONENBERGER ROSENFELD, LLP**
Karl S. Kronenberger (Bar No. 226112) (he/him/his)
karl@kr.law
Katherine E. Hollist (admitted *pro hac vice*) (she/her/hers)
kate@kr.law
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158

**POLLOCK COHEN LLP**
Raphael Janove (admitted *PHV*) (he/him/his)
rafi@pollockcohen.com
Adam Pollock (admitted *PHV*) (he/him/his)
adam@pollockcohen.com
111 Broadway, Suite 1804
New York, NY 10006
Telephone: (212) 337-5361

**JAY KUMAR LAW**
Jay Kumar (admitted *pro hac vice*) (he/him/his)
jay@jaykumarlaw.com
73 W. Monroe Street, Suite 100
Chicago, IL 60603
Telephone: (312) 767-7903

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| **CHARISSA KEEBAUGH, STEPHANIE NEVEU, HEATHER MERCIERI, SOPHIA NICHOLSON**, and **P.W.,** by and through **JOIE WEIHER**, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**WARNER BROS. ENTERTAINMENT INC.,** a Delaware corporation,<br><br>Defendant. | Case No. 2:22-cv-01272-MEMF (AGRx)<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**<br><br><br>Date:        October 6, 2022<br>Time:       10:00 a.m.<br>Before:     Hon. Maame Ewusi-Mensah Frimpong<br>Ctrm.:       8B |

1

**TABLE OF CONTENTS**

2   INTRODUCTION ............................................................................................................. 1

3   BACKGROUND ............................................................................................................... 2

4      A.    Game of Thrones Conquest...................................................................................... 2

5      B.    Defendant's Motion to Compel Arbitration.............................................................. 3

6   LEGAL STANDARD ....................................................................................................... 4

7   ARGUMENT .................................................................................................................... 5

8      A.    Defendant Does Not Show That Plaintiffs Had Inquiry Notice of TOU .......................... 5

9         1.    Warner Bros. Did Not Provide Conspicuous Notice ................................... 6

10         2.    Plaintiffs Did Not Unambiguously Manifest Assent to the Terms of Use............ 11

11      B.    Defendant's Terms of Use Are Unconscionable..................................................... 12

12      C.    Plaintiffs Can Seek Public Injunctive Relief in This Court ................................. 15

13      D.    Defendant's Terms Do Not Bind Minor P.W. ...................................................... 16

14         1.    California Law on Disaffirmance Applies ...................................................... 17

15         2.    P.W. Unequivocally Disaffirms and Disavows the TOU and His Purchases ....... 18

16   CONCLUSION................................................................................................................ 21

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*A.V. v. iParadigms Liab. Co.*,
    544 F. Supp. 2d 473 (E.D. Va. 2008) ............................................................ 20

*Armendariz v. Found. Health Psychcare Servs., Inc.*,
    24 Cal. 4th 83, 6 P.3d 669 (2000) ............................................................... 15

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011) .............................................................................. 16, 17

*B.D. v. Blizzard Ent., Inc.*,
    76 Cal. App. 5th 931 (2022) ................................................................... 10, 15

*Berman v. Freedom Fin. Network, LLC*,
    2020 WL 5210912 (N.D. Cal. Sept. 1, 2020) .................................................. 7

*Berman v. Freedom Fin. Network, LLC*,
    30 F.4th 849 (9th Cir. 2022) ............................................................... passim

*Blair v. Rent-A-Ctr., Inc.*,
    928 F.3d 819 (9th Cir. 2019) ................................................................... 18, 19

*Bohannon v. Facebook, Inc.*,
    82 F. Supp. 3d 1115 (N.D. Cal. 2015) ........................................................ 21, 24

*Boy Blue, Inc. v. Brown*,
    74 Va. Cir. 4 (2007) ..................................................................... 21, 22, 24

*Brooks v. IT Works Mktg., Inc.*,
    2022 WL 2079747 (E.D. Cal. June 9, 2022) ................................................. 10

*Brown v. Madison Reed, Inc.*,
    2021 WL 3861457 (N.D. Cal. Aug. 30, 2021) .............................................. 18

*Burnand v. Irigoyen*,
    86 P.2d 417 (Cal. 1947) ............................................................................ 24

*Capili v. Finish Line, Inc.*,
    116 F. Supp. 3d 1000 (N.D. Cal. 2015) ....................................................... 16

*Celli v. Sports Car Club, Inc.*,
    29 Cal. App. 3d 511 (Ct. App. 1972) ........................................................... 23

*Chavarria v. Ralphs Grocery Co.*,
    733 F.3d 916 (9th Cir. 2013) .................................................................... 15

*Colgate v. JUUL Labs, Inc.*,
    402 F. Supp. 3d 728 (N.D. Cal. 2019) ..................................................... 10, 11

*Cullinane v. Uber Techs., Inc.*,
    893 F.3d 53 (1st Cir. 2018) ..................................................................... 10, 11

*Doe v. Epic Games, Inc.*,
  435 F. Supp. 3d 1024 (N.D. Cal. 2020) ................................................................. 20, 22, 23, 24

*Doe v. Roblox Corp.*,
  --- F.Supp.3d---, 2022 WL 1459568 (N.D. Cal. May 9, 2022)................................. 12, 19, 20, 22

*Dohrmann v. Intuit, Inc.*,
  823 F. App'x 482 (9th Cir. 2020) ........................................................................ 10

*Fife v. Facebook, Inc.*,
  905 F.Supp.2d 989 (N.D. Cal. 2012) .................................................................... 22

*Fish v. Tesla, Inc.*,
  2022 WL 1552137 (C.D. Cal. May 12, 2022) ........................................................ 10

*Flittner v. Equitable Life Assur. Soc.*,
  30 Cal. App. 209 (1916)...................................................................................... 24

*Hodges v. Comcast Cable Commc'ns, LLC*,
  21 F.4th 535 (9th Cir. 2021)............................................................................... 18

*In re Ring LLC Priv. Litig.*,
  2021 WL 2621197 (C.D. Cal. June 24, 2021) ....................................................... 10

*In re Stubhub Refund Litig.*,
  2021 WL 5447006 (N.D. Cal. Nov. 22, 2021)........................................................ 5, 11

*Karla Maree v. Deutsche Lufthansa AG Anthony Castanares et al.*,
  2021 WL 4352912 (C.D. Cal. June 21, 2021) ....................................................... 11

*Kilgore v. KeyBank, Nat'l Ass'n*,
  718 F.3d 1052 (9th Cir. 2013)............................................................................. 14

*Kindred Nursing Centers Ltd. P'ship v. Clark*,
  137 S. Ct. 1421 (2017) ....................................................................................... 25

*Knutson v. Sirius XM Radio Inc.*,
  771 F.3d 559 (9th Cir. 2014)............................................................................... 5

*MacClelland v. Cellco P'ship*,
  2022 WL 2390997 (N.D. Cal. July 1, 2022)......................................................... passim

*MacGreal v. Taylor*,
  167 U.S. 688 (1897)........................................................................................... 20

*McArdle v. AT&T Mobility LLC*,
  772 F. App'x 575 (9th Cir. 2019) ........................................................................ 19

*McGill v. Citibank, N.A.*,
  2 Cal. 5th 45 (2017) .......................................................................................... 17

*McKee v. Audible, Inc.*,
  2017 WL 4685039 (C.D. Cal. July 17, 2017) ........................................................ 13, 14

*Meyer v. Uber Technologies, Inc.*,
  868 F.3d 66 (2d Cir. 2017).................................................................................. 10

*Molecular Analytical Systems v. Ciphergen Biosystems, Inc.*,
   186 Cal. App. 4th 696 (2010) ......................................................................... 24

*Morgan v. Sundance, Inc.*,
   142 S. Ct. 1708 (2022) ........................................................................... 1, 25

*Mustard v. Wohlford's Heirs*,
   56 Va. 329 (1859) ......................................................................................... 24

*Newton v. Am. Debt Servs., Inc.*,
   854 F. Supp. 2d 712 (N.D. Cal. 2012) ......................................................... 16

*Nguyen v. Barnes & Noble Inc.*,
   763 F.3d 1171 (9th Cir. 2014) ................................................................. 5, 7

*OTO, L.L.C. v. Kho*,
   8 Cal. 5th 111 (2019) ................................................................................... 14

*Peter v. DoorDash, Inc.*,
   445 F. Supp. 3d 580 (N.D. Cal. 2020) ......................................................... 10

*R.A. v. Epic Games, Inc.*,
   2019 WL 6792801 (C.D. Cal. July 30, 2019) ............................................. 23

*Regan v. Pinger, Inc.*,
   2021 WL 706465 (N.D. Cal. Feb. 23, 2021) ............................................... 10

*Rui Chen v. Premier Fin. All., Inc.*,
   2019 WL 280944 (N.D. Cal. Jan. 22, 2019) ................................................. 5

*Schmitt v. SN Servicing Corp.*,
   2021 WL 3493754 (N.D. Cal. Aug. 9, 2021) ............................................... 21

*Sellers v. JustAnswer LLC*,
   289 Cal. Rptr. 3d 1 (Cal. App. 4th. 2021) ........................................ 6, 12, 19

*Shroyer v. New Cingular Wireless Servs., Inc.*,
   498 F.3d 976 (9th Cir. 2007) ....................................................................... 15

*Snow v. Eventbrite, Inc.*,
   2020 WL 6135990 (N.D. Cal. Oct. 19, 2020) ...................................... 5, 9, 13

*Specht v. Netscape Commc'ns Corp.*,
   306 F.3d 17 (2d Cir. 2002) ............................................................................ 6

*Starke v. SquareTrade, Inc.*,
   913 F.3d 279 (2d Cir. 2019) ..................................................................... 9, 11

*T. K. v. Adobe Sys. Inc.*,
   2018 WL 1812200 (N.D. Cal. Apr. 17, 2018) ....................................... 21, 24

*Three Valleys Mun. Water Dist. V. E.F. Hutton & Co.*,
   925 F.2d 1136 (9th Cir. 1991) ....................................................................... 5

*Tillage v. Comcast Corp.*,
   772 F. App'x 569 (9th Cir. 2019) ................................................................. 19

*Ting v. AT&T,*
    319 F.3d 1126 (9th Cir. 2003) ................................................................. 15

*Vasquez v. Cebridge Telecom CA, LLC,*
    569 F.Supp.3d 1016 (N.D. Cal. 2021) ...................................................... 18

*Viking River Cruises, Inc. v. Moriana,*
    142 S. Ct. 1906 (2022) ............................................................................. 19

*Wayne v. Staples, Inc.,*
    135 Cal.App.4th 466 (2006) ..................................................................... 15

*Wilson v. Huuuge, Inc.,*
    944 F.3d 1212 (9th Cir. 2019) ................................................................. 14

*Yeomans v. World Fin. Grp. Ins. Agency, Inc.,*
    485 F. Supp. 3d 1168 (N.D. Cal. 2020) ............................................. 15, 16

**Statutes and Rules**

16 C.F.R. §233.1(a) ......................................................................................... 3

Cal. Family Code 6700 ................................................................................... 21

Cal. Family Code 6710 ................................................................................... 21

**INTRODUCTION**

Game of Thrones Conquest ("GOTC") has generated Defendant Warner Bros. Entertainment Inc. ("Defendant" or "Warner Bros.") over $750 million in revenue. Defendant makes enormous sums by leveraging some of the well-documented psychological weapons of "free to play" games, enticing players to spend far more than the cost of a typical for-purchase game. Warner Bros. falsely advertises "discounts," to convince users to spend hundreds of millions on a "free" game.

Instead of defending the merits of its supposedly "free" game—the same game that induced minor Plaintiff P.W. to spend ***$6,200*** within ***three weeks***—Warner Bros. has moved to compel arbitration, attempting to enforce an unconscionable contract of which Plaintiffs never had notice and to which they did not agree. *See* D.E. 41, Defendant's Motion and Memorandum of Points and Authorities ("Mem.") at 1. Defendant's arguments rely on the incorrect premise of a "liberal federal policy favoring arbitration." *See* Mem. at 7, 9. However, "[t]he federal policy is about treating arbitration contracts like all others, not about fostering arbitration." *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022).

The "onus" is on Warner Bros. "to put users on notice of the terms to which they wish to bind consumers." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022). But Warner Bros. "did not take that obligation to heart." *Id.* The only "notice" it provided to users, regarding their agreement to arbitrate and relinquish many of the statutory protections afforded to consumers, was on GOTC's sign-up screen. This screen buried an inconspicuous disclaimer about terms beneath a large, striking graphic image and encouraged users to click an outsized bright blue "Play" button. Therefore Warner Bros.'s Terms of Use ("TOU") and the arbitration agreement within it are unenforceable, and Defendant's Motion should be denied in its entirety.

Even if Defendant had demonstrated that Plaintiffs had sufficient notice of the TOU to unambiguously manifest assent to them, this Court should deny the Motion because the TOU are unconscionable, and Plaintiffs seek public injunctive relief. In addition, minor Plaintiff P.W. has disavowed Defendant's terms and cannot be forced to arbitrate.

//

//

**BACKGROUND**

**A.     Game of Thrones Conquest**

GOTC is based upon the popular HBO television series "Game of Thrones," which is an adaption of the "A Song of Ice and Fire" book series, which was written by George R.R. Martin. D.E. 39, First Amended Complaint ("FAC") ¶25. GOTC has been enormously successful, having been downloaded over 20 million times and made $750 million in revenue. *Id.* ¶¶26-27. GOTC makes money by offering players "microtransactions"—discrete in-app purchases of "packs" that contain virtual resources to allow players to advance in the game. *Id.* ¶¶27-30.

These in-app purchases cost gameplayers real and substantial currency. The packs necessary for these in-game upgrades each have a version that is offered at $99.99, $49.99, $19.99, $9.99, $4.99, and $0.99. *Id.* ¶31. GOTC aggressively markets the packs: each and every time a player logs into the game, a pop-up advertisement for a $99.99 pack fills the entire screen. Each displayed pack, whether located on the login pop-up ad, or on the right corner, has an hourglass timer counting down the time that the pack is still available to create a sense of urgency and scarcity to induce a player to immediately purchase a pack. *Id.* ¶¶33-34.

On top of these high-pressured sales tactics, Warner Bros. also deceptively, and falsely, promotes these packs as being on sale or discounted by misrepresenting that such packs include limited-time bonuses that purport to substantially increase the value of the packs. *Id.* ¶36. There are two primary categories of deceptive packs: (1) packs that offer the illusion of discounts on additional in-game "gold" through strikethrough graphics, and (2) packs that falsely advertise that a pack contains extra value by virtue of being on sale because of a holiday or as part of some other event. *Id.* ¶40. Warner Bros. uses false discounts and false reference pricing schemes to increase sales because they know these reference prices influence purchasing decisions, as consumers are enticed by bargains. *Id.* ¶38; *see also id.* ¶¶7-8; 16 C.F.R. §233.1(a).

Warner Bros.'s false discounting is particularly effective in influencing purchasing decisions because GOTC, like other free online games, is already highly addictive. FAC ¶39. Worse, even though minors are especially susceptible to these elements of the game's design—or perhaps precisely *because* minors are so susceptible—Warner Bros. specifically targets minors with its advertisements,

advertising that the game is for young players aged "12+." *Id.* ¶¶57-59; *id.* ¶60 (Society for the Study of Addiction: "Younger players may be particularly less equipped to critically appraise the value proposition of these [in-game] purchase schemes.").

Defendant's false and deceptive advertising caused Plaintiffs to make in-app purchases relying on the false and deceptive advertising. *Id.* ¶¶19-23. Minor Plaintiff P.W. fell victim to Defendant's scheme despite his parents' best efforts to monitor his phone usage. They allowed him access only because they believed, based on Warner Bros.'s representations, that it was safe for kids 12 and over. *Id.* ¶68. P.W. spent more than $6,200 in just three weeks in mid-March to early April 2022, purchasing dozens and dozens of packs. *Id.* ¶¶67-68; Declaration of Joie Weiher ("Weiher Decl.") ¶2. P.W. and his parents asked for refunds but were refused. FAC ¶87.

Plaintiffs allege that California law applies to all those who made a purchase in GOTC. *Id.* ¶¶97-102. They bring suit on behalf of themselves and all users of GOTC under California's Unfair Competition Law ("UCL"), False Advertising Law ("FAL"), and Consumers Legal Remedies Act ("CLRA"), and also assert claims for fraud, negligent misrepresentation, declaratory judgment (on behalf of P.W. and the Minor Subclass), as well as various state laws, to the extent California law does not apply.

Plaintiffs filed the original complaint on February 24, 2022, and the amended complaint on May 23, 2022.

## B.    Defendant's Motion to Compel Arbitration

On June 14, 2022, Warner Bros. moved to compel arbitration. D.E. 41. Defendant contends that Plaintiffs had inquiry notice of the TOU and that the TOU has a valid and binding arbitration clause.

Defendant has submitted three different versions of the sign-up screen for GOTC, which they contend provided Plaintiffs adequate notice. *See* D.E. 41-1, Woldman Decl., Exs. 6-7. Although GOTC is played on mobile phones with small screens, Defendant has artificially enlarged them to the size of a full page in their submission.

Defendant's Motion lacks factual support as to which of these sign-up screens Plaintiffs actually viewed. Although the Motion states the approximate dates that some of the sign-up screens were used, the declaration of an executive at Warner Bros. does not contain that information. *See* Mem. at 3-4

(citing Woldman Decl. ¶¶6, 8-9). In addition, Exhibit 7 of that declaration displays "Development Build," suggesting that it might not have ever been used.

Plaintiffs' counsel emailed Defendant's attorneys for clarification and asked if Defendant would amend its Motion with updated information. Defendant replied that "according to a preliminary review," the sign-up screen as reflected in Exhibit 5 of the Woldman Decl. existed up until December 19, 2019. *See* Declaration of Raphael Janove ("Janove Decl."), Ex. A. Assuming this is true, then up until December 2019, the sign-up screen featured large, striking graphics and a prominent blue "Play" button, beneath all of which it stated, in small non-descript font: "By tapping 'Play' I agree to the Terms of Service," with a link labeled "Terms of Service," but which linked to Warner Bros.'s "Terms of *Use*," *not* service.

Further, according to Defendant's counsel's "preliminary review," after December 2019, the phrase on the sign-up screen changed to: "By tapping 'Play' I accept the Terms of Use and acknowledge the Privacy Policy," but then contained a hyperlink labeled "Terms of Service," which confusingly took users to a document labeled "Terms of Use." *See* Mem. at 2-3.

In connection with this Motion, Plaintiffs submit the Declaration of Jay Kumar ("Kumar Decl."), which shows the sign-in as it currently appears and as it appeared as of, at least, May 2021. Importantly, the declaration contains pictures scaled to the sizes of popular mobile phones, rather than to the size of a computer screen. *See* Kumar Decl. ¶¶4-6.

## LEGAL STANDARD

"[T]he party seeking to compel arbitration[ ] has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). In determining whether to enforce a purported arbitration agreement, mutual manifestation of assent is required. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014). And "[i]n deciding whether there is a genuine issue of fact concerning formation of an agreement, the party opposing arbitration shall receive 'the benefit of all reasonable doubts and inferences.'" *Rui Chen v. Premier Fin. All., Inc.*, 2019 WL 280944, at *2 (N.D. Cal. Jan. 22, 2019) (quoting *Three Valleys Mun. Water Dist. V. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991)). //

**ARGUMENT**

As a threshold matter, Defendant has not submitted any evidence sufficient to show which sign-up screens any Plaintiff would have viewed. *See* Background Part B, above. For this reason alone, Defendant's Motion fails. *See, e.g.*, *In re Stubhub Refund Litig.*, 2021 WL 5447006, at *8 (N.D. Cal. Nov. 22, 2021) ("Because the Court does not know what sign-up screen these eight Plaintiffs saw when they registered, the Court cannot adequately assess whether they received constructive notice."); *Snow v. Eventbrite, Inc.*, 2020 WL 6135990, at *5 (N.D. Cal. Oct. 19, 2020) ("Eventbrite's first problem is broad and extends to all of its evidence. . . . [T]he evidence Eventbrite offers does not demonstrate what versions of the sign-in wrap agreements the plaintiffs would have seen during the relevant time period.").

In addition, Defendant's Motion fails because (1) the GOTC sign-up screens did not provide inquiry notice of the TOU; (2) the TOU are unconscionable; (3) Plaintiffs seek public injunctive relief, and (4) minor Plaintiff P.W. has disaffirmed the TOU.

**A.    Defendant Does Not Show That Plaintiffs Had Inquiry Notice of the TOU**

Defendant does not contend (nor could it) that Plaintiffs or the putative class had actual notice of the agreement to arbitrate. *See* Mem. at 9-11. Thus, to carry its burden, which is considerable, Defendant must establish that Plaintiffs and the putative class were on inquiry notice of the TOU. *See Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 35 (2d Cir. 2002)) ("Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility.").

The standard of inquiry notice is high because "users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print." *Berman*, 30 F.4th at 857.[1] And because companies like Warner Bros. have "complete control over the design" of their applications or websites, the "onus" is on them "to put users on notice of terms to which they wish to bind consumers." *Id.*; *see Sellers v.*

---

[1] Plaintiffs insist that California law applies. FAC ¶¶97-102. Defendant also argues in its motion that California law applies. *See* Mem. at 8.

1    *JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 30 (Cal. App. 4th. 2021) ("Because website providers have full

2    control over the design of their websites, the onus is on them to provide adequate notice of contractual

3    terms.") (citing *Nyugen*, 763 F.3d at 1178-79).

4          Therefore, courts will only enforce online agreements on an inquiry notice theory if: (1) there

5    is "reasonably conspicuous notice of the terms to which the consumer will be bound," ***and*** (2) "the

6    consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests

7    his or her assent to those terms." *Berman*, 30 F.4th at 856. Defendant's Motion does not meet either

8    requirement.

9          **1.    Warner Bros. Did Not Provide Reasonably Conspicuous Notice**

10         Whether the disclosure of the terms is sufficiently conspicuous "depends on the design and

11   content of the website and the agreement's webpage." *Nyugen*, 763 F.3d at 1177. Furthermore, "[g]iven

12   the breadth of the range of technological savvy of online purchasers, consumers cannot be expected to

13   ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be

14   bound." *Id.* at 1179. But this "ferret[ing]" is exactly what Warner Bros. expects consumers to do.

15         The design of the GOTC's sign-up screen failed to provide sufficient notice to bind Plaintiffs

16   to the arbitration clause. Several factors demonstrate the lack of reasonable conspicuousness, including:

17   (1) font size, particularly in comparison to other font sizes on the screen, (2) the overall format and

18   design of the web page or sign-up screen, and (3) whether it is apparent that text contains a hyperlink.

19   *See Berman*, 30 F. 4th at 856.

20         The following is an image of the GOTC sign-up screen as it would appear on Apple's iPhone

21   12, the top-selling iPhone in 2021, *not* as artificially inflated by Defendant in its filings. *See Berman v.*

22   *Freedom Fin. Network, LLC*, 2020 WL 5210912 (N.D. Cal. Sept. 1, 2020) (observing that the

23   hyperlinks were "formatted in black font against a white background which is exceedingly small

24   compared to the larger, more colorful and high-contrast fonts on the rest of the page, making it difficult

25   to read on a large, high-resolution monitor, *much less a mobile device*") (emphasis added); Kumar

26   Decl. ¶5.

27   //

28   //

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19   The screen's design—including font choice, distracting elements, and the inclusion of the large

20   blue "Play" button as the mode of assent—effectively hides the TOU and falls far short of providing

21   inquiry notice, for the following reasons.

22   *First*, the language relating to Defendant's TOU is hidden in small, transparent font, which is

23   vastly over-shadowed by the other elements. And small font is particularly inconspicuous where it is

24   "considerably smaller than the font used in the surrounding website elements," and where "[t]he

25   comparatively larger font used in all of the surrounding text naturally directs the user's attention

26   everywhere else." *Berman*, 30 F. 4th at 856-57.

27   In addition, "the textual notice is further deemphasized by the overall design of the webpage,

28   in which other visual elements draw the user's attention away from the barely readable critical text."

1    *Berman*, 30 F.4th at 857. Accordingly, "[f]ar from meeting the requirement that a webpage must take

2    steps to capture the user's attention and secure her assent, the design and content of these webpages

3    draw the user's attention away from the most important part of the page"—that by clicking the outsized

4    Play button directly below the striking graphic image of dragons, a user is agreeing to Defendant's

5    terms. *Id.* at 857; *see Snow*, 2020 WL 6135990, at *9 ("All of those buttons also use large, clear fonts;

6    the text of the disclaimer, in contrast, is small. The overall impression, consequently, would lead many

7    consumers to click one of the vibrant buttons while never knowing—and reasonably so—that the low-

8    contrast disclaimer subjects them to the [terms]."); *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 293 (2d

9    Cir. 2019) ("[T]he interface here is cluttered with diverse text, displayed in multiple colors, sizes and

10   fonts, and features various buttons and promotional advertisements that distract the reader from the

11   relevant hyperlink.").

12        The disclaimer language is also "further deemphasized" by another feature of the screen's

13   "overall design." *See Berman*, 30 F.4th at 857. The screen plays the Game of Thrones theme song, *see*

14   Kumar Decl. ¶3, further distracting users.

15        *Second*, the sign-up screen does not make it apparent that there is a hyperlink for a consumer to

16   click on to reach the TOU. Below the graphics and large Play button, plain white text states: "Terms

17   of Service." This confuses users, who would have to intuit that "Terms of Service" actually meant

18   "Terms of Use."

19        This text also lacks any of the "[c]ustomary design elements denoting the existence of a

20   hyperlink." *Berman*, 30 F.4th at 857. The phrase "Terms of Service" is neither underlined, in all capital

21   letters, nor in contrasting color such as blue, and therefore fails to "alert[s] a user that the particular

22   text differs from other plain text in that it provides a clickable pathway to another webpage." *Id.*; *see*

23   *Brooks v. IT Works Mktg., Inc.*, 2022 WL 2079747, at *6 (E.D. Cal. June 9, 2022) ("No [c]ustomary

24   design elements denoting the existence of a hyperlink,' such as 'contrasting font color' or 'the use of

25   all capital letters,' were used to make the Terms of Use hyperlink more noticeable.") (quoting *Berman*,

26   30 F.4th at 857); *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 764 (N.D. Cal. 2019) (inconspicuous

27   notice where "the hyperlink to the Terms and Conditions was not a different color, underlined,

28   italicized, or in any way visually distinct from the surrounding text").

On very close examination there is a shape of a box drawn in a thin line around "Terms of Service." Nonetheless, that does not make the hyperlinks conspicuous because the box is "barely legible to the naked eye." *See Berman*, 30 F.4th at 856-57; *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63 (1st Cir. 2018) (insufficient notice where "the 'Terms of Service & Privacy Policy' hyperlink was presented in a gray rectangular box in white bold text"). And a user cannot be expected to "aimlessly click words" on the sign-up screen to "ferret out hyperlinks." *Berman*, 30 F.4th at 857 (holding that even underlined hyperlinks "fail[ed] our conspicuousness test"). But Warner Bros.'s design requires them to do so. *Id.*;[2] *see Brooks*, 2022 WL 2079747, at *6  ("The text of that hyperlink is so small that it is barely visible to the naked eye, and coupled with its muted grey color and background, it is considerably deemphasized in relation to the other text on the webpage."); *Colgate*, 402 F. Supp. 3d at 766 ("A reasonable user scanning the page would first see the 'Forgot Password?' hyperlink and would observe that it is a different color, underlined, and of a particular font size. That user would not then see the 'Terms and Conditions' and 'Privacy Policy' hyperlinks and conclude that they were clickable. They are not underlined, they are the same size as the sentence they are in, and the color is different from the initial hyperlink they would see."); *Cullinane*, 893 F.3d at 63-64 ("[T]he presence of other terms on the same screen with a similar or larger size, typeface, and with more noticeable attributes diminished the hyperlink's capability to grab the user's attention."); *Karla Maree v. Deutsche Lufthansa AG Anthony Castanares et al.*, 2021 WL 4352912, at *3 (C.D. Cal. June 21, 2021) ("[T]he design of Expedia.com's website was extremely cluttered, rendering the Terms of Use link visually indistinct from the many other links on the page.").

//

---

[2] For these reasons, Defendant's citation to *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66 (2d Cir. 2017) and other authorities are misplaced. *See* Mem. at 10; *Berman*, 30 F.4th at 857 (distinguishing *Meyer* because that decision found "the hyperlinks reasonably conspicuous because they were both in blue and underlined"); *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482, 484 (9th Cir. 2020) ("The relevant warning language and hyperlink to the Terms of Use were conspicuous – they were the only text on the webpage in italics, were located directly below the sign-in button, and the sign-in page was relatively uncluttered."); *Fish v. Tesla, Inc.*, 2022 WL 1552137, at *4 (C.D. Cal. May 12, 2022) (hyperlinks shown in "bolded and/or underlined text"); *In re Ring LLC Priv. Litig.*, 2021 WL 2621197, at *6 (C.D. Cal. June 24, 2021) (notice sufficient where sign-in pages were "less cluttered" than in *Dohrmann* and hyperlinks were in blue text); *Regan v. Pinger, Inc.*, 2021 WL 706465, at *5 (N.D. Cal. Feb. 23, 2021) at *2 (hyperlinks were in blue on a single sign-up screen that lacked the distracting features of Warner Bros.); *Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580, 586 (N.D. Cal. 2020) (sign up screens were "uncluttered" and hyperlinks were in blue); *B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931, 951 (2022) (terms were displayed in pop-up notice that "consisted primarily of a scrollable text box that contained the entire 2018 License Agreement").

*Third*, the large blue "Play" button further demonstrates the lack of inquiry notice. The word "Play" gives no indication that by clicking, the consumer agrees to Warner Bros.'s terms. Nor does it put them on inquiry notice that they should search for those terms. *See Stubhub Refund Litig.*, 2021 WL 5447006, at *5 (buttons labeled "This is correct, Continue!" and "Continue" provided insufficient notice as they "plainly refer to the entry of other information on the page, not assent to the Terms & Conditions"). In fact, the blue "Play" button only serves to obscure any assent to notice. The stark contrast between the large bright blue button, which commands a user's attention to press "Play," with the plain, small font following it "makes it hard to escape the inference that [Warner Bros.] hoped the reader's eye would be drawn elsewhere." *Starke*, 913 F.3d at 294.

All told, the GOTC sign-up screen is far less conspicuous than even what the Ninth Circuit in *Berman* rejected as insufficient. There, the hyperlinks were underlined, and the disclaimer language appeared above the large green "Continue" buttons. *See Berman*, 30 F.4th 849 at Appendices A&B:




10

Finally, the GOTC sign-up screen is woefully deficient as to minor Plaintiff P.W., particularly given that Warner Bros. knows that minors use GOTC and represents that the game is safe for kids 12 and over. *See* FAC ¶¶68, 161; *Doe v. Roblox Corp.*, --- F.Supp.3d---, 2022 WL 1459568, at *6 (N.D. Cal. May 9, 2022) ("Taken together, these considerations lead me to conclude that Doe did not give a sufficient outward manifestation of intent to be bound by the Terms of Use. She was 10 years old. Roblox knew her age. It did not require her to get an adult's permission or supervision. And the only indication that she was agreement [*sic*] to complicated terms of use was a not-so-conspicuous disclaimer above a bright sign-up button."); *Sellers*, 73 Cal. App. 5th at 475 ("Importantly, the website service at issue here is marketed towards users as young as 13 years old. Even if children knew how to use a smartphone and are familiar with the internet, they are not likely to understand that their use of a website may be governed by contractual terms, or that those terms may be included in a hyperlinked 'terms of use.'").

### 2.  Plaintiffs Did Not Unambiguously Manifest Assent to the Terms of Use

Because Defendant fails to show that the TOUs were reasonably conspicuous, its Motion can be denied outright. Defendant also fails to satisfy the second requirement of inquiry notice: that "the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman* 30 F.4th at 856. Even when viewed by a consumer with a close and discerning eye, Warner Bros. has made it unclear what terms the consumer is even agreeing to.

Below the big blue "Play" button, in small, plain-white text, the sign-up screen advises users: "By tapping 'Play' I ***accept*** the Terms of Use." It does not state that a user *agrees* to the terms of use. Further, nothing on the sign-up screen references the "Terms of Use." Instead, there is plain white text stating: "Terms of Service."

Therefore, not only would a user (a) have to look at the plain text below, despite attention elsewhere being focused on having the user click Play, and (b) then intuit that plain white text actually also contained a hyperlink, the user (c) "would also need to surmise that [Warner Bros.] really meant that" Terms of Service meant Terms of Use. *McKee v. Audible, Inc.*, 2017 WL 4685039, at *8 (C.D. Cal. July 17, 2017). Warner Bros. simply "ask[s] too much . . . and this level of notice is inferior to

most of the cases where sign-in-wrap, or clickwrap agreements have been enforced." *See id.* (insufficient notice where the disclosure to consumers referenced "Conditions of Use," whereas the document that it sought to bind consumers was titled "Audible's Terms of Use"); *see also Snow*, 2020 WL 6135990 at *8 (insufficient notice where users had the option to select "Get started," "Continue with Apple," or "Continue with Facebook," but where the disclaimer only stated users accepted the terms by selecting "Get Started" or "Continue with Facebook.").

Even the sign-up screen that purportedly existed in July 2018 and June 2019 does not show the unambiguous manifestation of assent. *See* Mem. at 2. That screen states that "By tapping 'Play' I agree to the Terms of Service" and the link reads "Terms of Service." However, if the user finds and clicks the link, they are taken instead to a document labeled "Terms of Use." *See* Mem. at 3. This neither provides sufficient notice nor an unambiguous manifestation of assent, as, a user would have to "surmise" that Terms of Service meant Terms of Use. *See McKee*, 2017 WL 4685039, at *8.

It bears repeating that "the onus" is on Defendant "to put users on notice of the terms to which they wish to bind consumers." *Berman*, 30 F.4th at 857. And "nothing prevents" Warner Bros. from ensuring that GOTC "provides disclosures that are properly labelled, conspicuously located, and linguistically precise." *McKee,* 2017 WL 4685039, at *8. If Warner Bros. "wishes to condition use of [GOTC] on a customer's willingness to forgo access to the courts, it must do so carefully, as indeed many other companies have." *Id.* Warner Bros. has not, so its Motion fails. *See id.; Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1221 (9th Cir. 2019) ("Instead of requiring a user to affirmatively assent, Huuuge chose to gamble on whether its users would have notice of its Terms. The odds are not in its favor.").

## B.   Defendant's Terms of Use Are Unconscionable

"Under California law, 'a contractual provision is unenforceable if it is both procedurally and substantively unconscionable.'" *MacClelland v. Cellco P'ship*, 2022 WL 2390997, at *4 (N.D. Cal. July 1, 2022) (quoting *Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013)). Where there is a high degree of procedural unconscionability, "even a low degree of substantive unconscionability may suffice to render the agreement unenforceable." *OTO, L.L.C. v. Kho*, 8 Cal. 5th 111, 130 (2019). Defendant's Terms of Use are both procedurally and substantively unconscionable. //

The TOU is procedurally unconscionable because it is a non-negotiable "take it or leave it" contract of adhesion. *See MacClelland*, 2022 WL 2390997, at *5 (citing *Ting v. AT&T*, 319 F.3d 1126, 1148 (9th Cir. 2003)); *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 6 P.3d 669, 113 (2000) (a contract of adhesion "relegates to the subscribing party only the opportunity to adhere to the contract or reject it").[3] The defects described above ensure that Defendant's terms come as a surprise to consumers; Defendant does not even attempt to argue that any specific Plaintiff ever clicked on the non-descript words "Terms of Service" that furtively linked to the Terms of Use. *See Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 922 (9th Cir. 2013) ("Surprise involves the extent to which the contract clearly discloses its terms as well as the reasonable expectations of the weaker party."); *Yeomans v. World Fin. Grp. Ins. Agency, Inc.*, 485 F. Supp. 3d 1168, 1188 (N.D. Cal. 2020).[4]

The TOU is also substantively unconscionable. As further explained in Part C, below, the arbitration agreement's purported ban on public injunctive relief violates clear California law. *See MacClelland*, 2022 WL 2390997, at *8. In addition, the game is openly marketed to minors but asks *only* that the minor (and not a parent or guardian) agree to the terms. TOU §3. Despite a minor's right to disaffirm a contract, *see* Part D, below, the terms state that "All purchases are final and **no refunds are available**." TOU §6 (emphasis in original). The TOU also unconscionably waives the right to a jury trial. *See MacClelland*, 2022 WL 2390997, at *7. In addition, the TOU unconscionably requires claims to be brought within one-year, even though Plaintiffs' claims have three-to-four-year statutes of limitations. TOU §15; *see MacClelland*, 2022 WL 2390997, at *7 (the "short notice provision here erects a potential trap to the unwary").

//

---

[3] Defendant incorrectly argues that there is nothing procedurally unconscionable because Plaintiffs could have played another video game. However, Defendant relies on a California case that has been explicitly rejected by the Ninth Circuit. *See Mem* at 13 (citing *Wayne v. Staples, Inc.*, 135 Cal.App.4th 466, 482 (2006)); *Shroyer v. New Cingular Wireless Servs., Inc.*, 498 F.3d 976, 985 (9th Cir. 2007) ("[W]e have consistently followed the courts that reject the notion that the existence of 'marketplace alternatives' bars a finding of procedural unconscionability.") (collecting cases).

[4] Defendant argues lack of surprise because GOTC players "can reasonably expect "'a continuing, forward-looking relationship governed by terms and conditions.'" Mem. at 11 (quoting *B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931, 946 (2022)). However, in *B.D.*, the player encountered a pop-up during the sign-up process that advised that "'By Clicking Continue,' the user acknowledges he or she has read and understood the License Agreement." *Id.* As the court specifically noted, "[U]nlike in *Sellers*, users did not need to ferret out hyperlinks to terms and conditions. Blizzard directly provided those terms and conditions." *Id.* at 951 (internal quotations and citations omitted).

Further, the TOU contains a substantively unconscionable limitation of liability, precluding punitive and other damages that would be available to Plaintiffs. TOU §14; *MacClelland*, 2022 WL 2390997, at *8 ("California courts have found substantive unconscionability where an arbitration clause limits the types of remedies that would be available under the statute.") (citing *Newton v. Am. Debt Servs., Inc.*, 854 F. Supp. 2d 712, 724 (N.D. Cal. 2012)).

As a result, the TOU is so "permeated" with unconscionability that the entire agreement is unenforceable, notwithstanding the TOU's severance clause. *MacClelland*, 2022 WL 2390997, at **15-16 ("Here, there is strong evidence that Verizon was trying to impose an 'inferior forum' on its customers.). To hold that some claims can be severed instead of the entire TOU would "create[] a 'perverse incentive.'" *Id.* (quoting *Capili v. Finish Line, Inc.*, 116 F. Supp. 3d 1000, 1009 (N.D. Cal. 2015), *aff'd*, 699 F. App'x 620 (9th Cir. 2017)). As *MacClelland* explained:

> If the Court were to sever the numerous unconscionable provisions in a case such as this, companies could be incentivized to retain unenforceable provisions designed to chill customers' vindication of their rights, then simply propose to sever these provisions in the rare event that they are challenged successfully in court.

*Id.*.[5]

Moreover, the severance clause is also an egregiously unconscionable term.  Before such a claim can be severed under this provision—such as one for public injunctive relief or for punitive damages, which cannot even be sought in arbitration—the TOU require a consumer to specifically litigate *and exhaust all appeals* on the issue of whether this illegal bar on individualized relief applies. TOU §16 ¶F. So not only does the TOU seek to force consumers into an arbitration proceeding that can never provide the relief they are entitled to under California law, but consumers must also wait until completely exhausting the arbitration process including appeals—a process transparently

---

[5] Defendant contends that the arbitration clause is "identical" to the one upheld in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336, 352 (2011). *See* Mem. at 12. However, the TOU here is unconscionable based on many different provisions in the TOU, not just one clause in the agreement itself. Plaintiffs' argument therefore does not conflict with *Concepcion*. *See Yeomans*, 485 F. Supp. 3d at 1176 ("[A]rbitration agreements may 'be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.'") (quoting *Concepcion*, 563 U.S. at 339).

designed to prevent their vindication of consumer rights "for years and possibly ever." *MacClelland*, 2022 WL 2390997, at *16.

"In sum, the arbitration clause and the applicable limitations as a whole demonstrate a systematic effort to impose arbitration on a customer as an inferior forum." *Id.* And because the "object of the [TOU] is to force [Defendant's] consumers into an inferior (and, in many circumstances, wholly ineffective) forum," *id.*, this Court should hold that the arbitration clause is unconscionable and unenforceable.

**C.    Plaintiffs Can Seek Public Injunctive Relief in this Court**

Even if the terms were not unconscionable, at a minimum, Plaintiffs' claims that seek public injunctive relief cannot be arbitrated.

Defendant asks the Court to compel arbitration *individually* and proscribe anything but relief on an individual basis. *See* Mem. at 17 ("At all relevant times, the TOU provided (in identical language) for individualized arbitration without class procedures."). But "[u]nder California law, a contractual provision purporting to waive the right to seek public injunctive relief in any forum is unenforceable." *MacClelland*, 2022 WL 2390997, at *8 (citing *McGill v. Citibank, N.A.*, 2 Cal. 5th 45 (2017)). The so-called *McGill* rule, which "prohibits the waiver of the right to pursue public injunctive relief in any forum," does not violate the FAA because it "is a generally applicable contract defense derived from long-established California public policy." *Blair v. Rent-A-Ctr., Inc.*, 928 F.3d 819, 828 (9th Cir. 2019).

Plaintiffs seek an injunction barring Defendant from engaging in the deceptive advertising practices and violating the UCL, FAL, and CLRA. This is "[t]he paradigmatic example [of public injunctive relief]." *MacClelland*, 2022 WL 2390997, at *9 (alterations in original) (quoting *Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535, 542 (9th Cir. 2021)). Indeed, "the statutory schemes set out in 'the UCL, the CLRA, and the false advertising law' are explicitly designed to provide for 'public injunctive relief' that is 'by definition' 'primarily for the benefit of the general public.'" *MacClelland*, 2022 WL 2390997, at *9 (quoting *Vasquez v. Cebridge Telecom CA, LLC*, 569 F.Supp.3d 1016, 1026 (N.D. Cal. 2021) (alterations omitted)).

The TOU's arbitration provision improperly prohibits *any* method of obtaining aggregate relief in *any* forum—including for public injunctions. *See, e.g.*, TOU §16 ¶F ("The arbitrator may award

declaratory or injunctive relief ***only in favor of the individual party*** seeking relief and ***only*** to the extent necessary to provide relief warranted by that party's individual claim.") (emphasis added).[6] And "[t]his language is virtually identical to the language" that other courts have declined to enforce because it improperly prevents a plaintiff from "seek[ing] public injunctive relief in arbitration." *Brown v. Madison Reed, Inc.*, 2021 WL 3861457, at **7-8 (N.D. Cal. Aug. 30, 2021) ("[T]he [unenforceable] provision here is more restrictive and authorizes an arbitrator to award 'injunctive relief *only in favor of the claimant* and *only to the extent necessary to provide relief warranted by the claimant's individual claim.*'") (emphasis in original) (citing *Tillage v. Comcast Corp.*, 772 F. App'x 569 (9th Cir. 2019) and *McArdle v. AT&T Mobility LLC*, 772 F. App'x 575 (9th Cir. 2019)).

Because Warner Bros.'s TOU "preclude[es] injunctive relief benefitting anyone other than the individual claimant, the contract prevents Plaintiffs from seeking public injunctive relief in any forum, a right which cannot be denied whether in arbitration or otherwise." *MacClelland*, 2022 WL 2390997, at *8. Thus, at the very least, Defendant's Motion must be denied as to the public injunctive relief Plaintiffs seek. *See id.*; *see also Blair*, 928 F.3d at 832 (holding that a similar severance clause as Defendant's TOU required "that the entire claim be severed for judicial determination").[78]

**D.    Defendant's Terms Do Not Bind Minor Plaintiff P.W.**

Even if this Court were to conclude that Defendant provided sufficient notice to the other Plaintiffs to establish mutual assent, Warner Bros.'s sign-up screen—for a game marketed to 12-year-olds—still failed to provide inquiry notice to minor Plaintiff P.W. *See Roblox*, 2022 WL 1459568, at **5-6 ("Even if the notice would be sufficiently conspicuous and understandable for an adult, it is not for a child—at least as a matter of law at this pre-evidentiary stage. . . . [And] the only indication that she was agreement [sic] to complicated terms of use was a not-so-conspicuous disclaimer above a

---

[6] Throughout this Memorandum, Plaintiffs refer to the TOU as it appears in Exhibit 3 of the Woldman Decl. for simplicity.
[7] In addition, *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906 (2022), does not "overrule[] or undermine[]" *McGill's* core holding that an arbitration agreement cannot prohibit a party from seeking public injunctive relief in any forum." *MacClelland*, 2022 WL 2390997, at *9 ("Importantly, *Viking River* found that the FAA does not preempt a rule of California law prohibiting wholesale waivers of the right to assert representative claims under PAGA.").

[8] In the alternative, should the Court determine that Plaintiffs failed to adequately plead facts which demonstrate that they seek public injunctive relief, Plaintiffs respectfully request leave to amend their Complaint to clarify this point. Defendant's ongoing deceptive advertising practices pose a danger to the public at large, not just those players unfortunate enough to have already been deceived by them.

**PLNTFS' OPP. TO DEF'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

bright sign-up button."); *Sellers*, 73 Cal. App. 5th at 475 ("Importantly, the website service at issue here is marketed towards users as young as 13 years old. Even if children know how to use a smartphone and are familiar with the internet, they are not likely to understand that their use of a website may be governed by contractual terms, or that those terms may be included in a hyperlinked 'terms of use.'").

Regardless, P.W. has disaffirmed Warner Bros.'s TOU and therefore he and the Minor Subclass cannot be forced to arbitrate their claims, as discussed below.

### 1. California Law on Disaffirmance Applies

As Defendant concedes, the Court should use California's choice-of-law analysis, which requires courts to "apply California law" unless the parties "identify a meaningful conflict between California law and the law of another state." Mem. at 8. Defendant has not identified any conflict. It also cites primarily to California authorities on disaffirmance. The Court should therefore apply California law on this issue. *Roblox Corp.*, 2022 WL 1459568, at *4 ("[B]oth parties rely on cases applying California law and I follow suit.").[9]

In addition, it is appropriate to apply California law to claims by P.W. and the minor subclass because Warner Bros. is located in this State, the TOU requires that any dispute be interpreted under

---

[9] In a long string that includes primarily California authorities, Defendant includes just one case from Virginia. But Defendant does not argue that the cited case reflects any conflict between Virginia and California law on disaffirmance. *See* Mem. at 13-14 n.2; *see also Doe v. Epic Games, Inc.*, 435 F. Supp. 3d 1024, 1035 n.2 (N.D. Cal. 2020) ("the disaffirmance analysis would not necessarily vary based on which law was applied"). To the extent Defendant implicitly suggests a conflict, Defendant's sole Virginia authority, *A.V. v. iParadigms Liab. Co.*, 544 F. Supp. 2d 473 (E.D. Va. 2008), which it cites to accuse P.W. of using disaffirmation as a "sword" to "injure" Warner Bros., is readily distinguishable.

Defendant's quoted language from *A.V.* does not come from an authority on a unique provision of Virginia law. Instead, *A.V.* relied on an older U.S. Supreme Court case that broadly affirmed the right of a minor to disavow a contract, even if the hardship is one sided. *See A.V.*, 544 F. Supp. 2d at 481; *MacGreal v. Taylor*, 167 U.S. 688, 700 (1897) ("If the minor, when avoiding his contract, have in his hands any of its fruits specifically, the act of avoiding the contract by which he acquired such property will devest him of all right to retain the same, and the other party may reclaim it. . . . And the adult who deals with him . . . with the same chances of loss in the one case as in the other. . . . It is not necessary, in order to give effect to the disaffirmance of the deed or contract of a minor, that the other party should be placed in statu [sic] quo.") (citations omitted). Thus, *MacGreal* stands for the unremarkable proposition that if a minor disaffirms a contract, it must return the property or consideration it received as part of that contract if it is still "under his control." *Id.* at 701.

Furthermore, P.W. played Defendant's game for three weeks and spent $6,200 on purchases. And P.W. did not retain anything from the thousands he spent on the game, whereas in *A.V.* plaintiffs retained the benefit of the agreement—"[t]hey received a grade from their teachers." 544 F.Supp.2d at 481. To the extent *A.V.* meant something else, it misstates Virginia law. *See Boy Blue, Inc. v. Brown*, 74 Va. Cir. 4, at *5 (2007) ("He who deals with an infant deals at his peril and subject to this right of the infant to disaffirm and avoid the contract.").

---

**PLNTFS' OPP. TO DEF'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

California law, and Defendant's unlawful conduct and false statements emanated from California. *See* FAC ¶¶97-102. As the court in *I.B. by & through Bohannon v. Facebook, Inc.*, 82 F. Supp. 3d 1115, 1121 (N.D. Cal. 2015), explained:

> It was Facebook that selected California law to apply to interactions between itself and its users, and thus it should come as no surprise that Facebook's own conduct would also be considered through the lens of California law. . . . Application of Facebook's SRR in such a manner is consistent with the purpose, dating to the 1870s, of California's laws regarding the power of minors to contract—laws that were designed as much to prevent California adults from contracting with minors as they were to protect minors who entered into contracts.

The fact that P.W. disaffirms the agreement does not alter this analysis. *T. K. v. Adobe Sys. Inc.*, 2018 WL 1812200, at *6 (N.D. Cal. Apr. 17, 2018) ("Moreover, T.K.'s reference to the choice of law provision in the terms of service is not inconsistent with her disaffirmance of the entire contract. T.K. explicitly states that she and the Class 'are not subject to the ACCP General Terms of Use,' but T.K. argues that '[b]y choosing California law for the resolution of disputes in the agreement, Adobe concedes that it is appropriate for this Court to apply California law to the instant dispute.'"); *see also*, *e.g.*, *Schmitt v. SN Servicing Corp.*, 2021 WL 3493754, at *4 (N.D. Cal. Aug. 9, 2021) (applying California law to out-of-state plaintiffs and class members).

## 2. P.W. Unequivocally Disaffirms and Disavows the TOU and His Purchases

Under California law, a minor has capacity to contract, but must be allowed to disaffirm the same. *See* Cal. Family Code 6700 ("[A] minor may make a contract in the same manner as an adult, subject to the power of disaffirmance."); Cal. Family Code 6710 ("Except as otherwise provided by statute, a contract of a minor may be disaffirmed by the minor before majority or within a reasonable time afterwards."); *see also Roblox*, 2022 WL 1459568, at *6 ("California law (like the common law) permits minors to disaffirm most contracts, rendering them void."); *I.B. ex rel. Fife v. Facebook, Inc.*, 905 F.Supp.2d 989, 1000 (N.D. Cal. 2012) ("Disaffirmation by a minor rescinds the entire contract, rendering it a nullity.").[10]

---

[10] Virginia law is the same. *See Boy Blue*, 74 Va. Cir. 4, at *5 ("A disaffirmance avoids the infant's contract ab initio, and the parties revert to the same situation as if the contract had never been made. The right of an infant to void his contract is an absolute and paramount right, superior to all equities of other persons. He who deals with an infant deals at his peril and subject to this right of the infant to disaffirm and avoid the contract.").

###### i.     P.W. has clearly disaffirmed the TOU.

P.W. has made it clear that he has disaffirmed the contract by the act of filing this lawsuit and, in addition, explicitly alleging so. *See, e.g.*, *Doe v. Epic Games, Inc.*, 435 F. Supp. 3d 1024, 1035 (N.D. Cal. 2020) ("Disaffirmance may be made by any act or declaration indicating an intent to disaffirm. . . . In other words, express notice to the other party is unnecessary . . . and no specific language is required to communicate an intent to disaffirm.") (citations, quotations, and alterations omitted). As the allegations make clear, (a) his parents no longer let him play GOTC, FAC ¶68; (b) P.W. and his parents attempted to receive refunds for each of his in-app purchases, but were refused, *id*. ¶¶69, 77; (c) "Minor Plaintiff and his guardians have, by no later than the date of the First Amended Complaint, disaffirmed all in-game purchases made through GOTC to date and requested a refund," *id*. ¶164 (emphasis added); and (d) he is seeking, *inter alia*, declaratory judgment that this case may proceed as a class action and that the sales contracts with Defendant are voidable, *id*. ¶167.

These statements and P.W.'s actions more than sufficiently disclose his "unequivocal intent to repudiate" his agreements with Defendant, including to arbitrate, as "the minor's power to disaffirm a contract is broad and can be invoked through 'any act or declaration' that conveys his intent to repudiate a contract." *Epic Games*, 435 F. Supp. 3d at 1036 (quoting *Celli v. Sports Car Club, Inc.*, 29 Cal. App. 3d 511, 517 (Ct. App. 1972)).

To the extent there is any doubt, P.W. submits a declaration from his parent confirming that P.W. disavows and disaffirms the TOU and that he no longer plays GOTC. Weiher Decl. ¶¶7-8; see *R.A. v. Epic Games, Inc.*, 2019 WL 6792801, at *6 (C.D. Cal. July 30, 2019) ("The present case involves a motion to compel arbitration where extrinsic evidence, including declarations, is considered and both sides filed multiple declarations in support of their positions."). This declaration "unequivocally expresses" P.W.'s "intent to disaffirm" the TOU. *See R.A.*, 2019 WL 6792801, at *7. Moreover, "there is no evidence . . . that Plaintiff continued playing [GOTC] after he submitted his declaration that would contradict his intent to disaffirm the entirety of the [TOU]." *Id*.

###### ii.     P.W.'s parents did not agree to the TOU on his behalf.

Defendant argues that "a minor cannot disaffirm an arbitration agreement entered into by a legal guardian." *See* Mem. at 13 n.2. This is both inaccurate and irrelevant. Here, P.W., not his parents,

downloaded and installed GOTC. Weiher Decl. ¶3. P.W.'s parents did not enter into any contract with Defendant on P.W.'s behalf. Weiher Decl. ¶¶4-6.

### iii.        P.W. may disavow the contract despite playing the game.

The Court should also reject Defendant's astonishing contention that P.W.'s disaffirmance is somehow unfair to Warner Bros. and thus "P.W. … could not disaffirm the TOU after enjoying access to the game." Mem. at 13 n.2. Defendant's highly addictive game that specifically target minors is rife with predatory monetization schemes, and unlawfully claims that purchases are non-refundable. P.W. did not benefit from playing GOTC in any way that remotely approaches how Defendant benefitted—raking in $6,200 from P.W. for just a few weeks of game play. And P.W., who is no longer playing the game, is certainly not retaining any unfair benefit following his disaffirmance. *See* FAC ¶¶38-39, 57-71.[11]

Further, because P.W. no longer plays GOTC, "this is not a case in which a minor seeks to adopt that part of an entire transaction which is beneficial, and reject its burdens." *Epic Games*, 435 F. Supp. 3d at 1037; *T. K.* , 2018 WL 1812200, at **5-6 (denying motion to compel arbitration, despite "the principles that a minor cannot continue to receive the benefits of a contract after disaffirming and that a minor cannot disaffirm only parts of a contract," because the minor "has disaffirmed the entire" contract and ceased to use defendant's services).

Permitting minors to disavow contracts "reflect[s] both a strong public policy in favor of protecting minors, and, even more so, of discouraging adults from contracting with minors." *Facebook*, 82 F. Supp. 3d at 1122 ("The policy of the law is to discourage adults from contracting with an infant and they cannot complain if as a consequence of violating the rule they are injured by the exercise of the right of disaffirmance vested in the infant." *Id*. (emphasis in original) (quoting *Burnand v. Irigoyen*, 86 P.2d 417 (Cal. 1947); *Flittner v. Equitable Life Assur. Soc.*, 30 Cal. App. 209, 216 (1916) ("This position may seem, under all the circumstances of the case, to be a hardship on the defendant, but 'the

---

[11] Defendant also argues that P.W. cannot disaffirm because this action "'derives from, relies on, or is intimately intertwined with the subject contract containing the arbitration agreement.'" Mem. at 13-14 n.2 (quoting *Molecular Analytical Systems v. Ciphergen Biosystems, Inc.*, 186 Cal. App. 4th 696, 717 (2010)). But *Molecular* had nothing to do with a minor's right to disavow a contract, and instead dealt with equitable estoppel and whether a non-signatory "has a right to enforce the arbitration agreement." *Id.* at 717.

right of an infant to avoid his contracts is one conferred by law for his protection against his own improvidence and the designs of others.'").[12]

### iv.        Disaffirmance is fully consistent with the FAA.

Finally, Defendant confusingly argues that P.W.'s disavowal of the entire contract would violate the "FAA's 'equal-treatment' principle." Mem. at 14 n.2 (quoting *Kindred Nursing Centers Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017)). But this principle simply means that while "[a] court may invalidate an arbitration agreement based on generally applicable contract defenses," it cannot do so based on "on legal rules that apply only to arbitration." *Kindred*, 137 S. Ct. at 1426. Here, however, P.W. disavows the entire contract based on California statutes and legal rules that apply to contracts generally, not rules that somehow treat arbitration clauses differently. Indeed, as discussed above, P.W. disaffirms any and all agreements between him and Defendant, not only the arbitration clause. This is fully consistent with the "equal-treatment" principal. The Court should reject Defendant's attempt to elevate the status of the arbitration clause over other provisions of the agreement and make it somehow immune from generally applicable principles of capacity and disaffirmance. *See Morgan v. Sundance, Inc*., 142 S. Ct. 1708, 1713 (2022) ("The federal policy is about treating arbitration contracts like all others, not about fostering arbitration.").

### CONCLUSION

Defendant seeks enforcement of an arbitration provision in an unconscionable agreement to which they never obtained mutual assent. Its Motion flaunts binding Ninth Circuit precedent on inquiry notice, California law prohibiting bars on aggregated relief in cases seeking public injunctions, and a minor's right to disaffirm a contract. For all these reasons, Plaintiffs respectfully request that the Court deny Defendant's Motion to Compel Arbitration and Stay Case in its entirety. In the alternative, Plaintiffs request that the Court at least deny the Motion with respect to Plaintiffs' CLRA, FAL, and UCL claims, and that it further deny the Motion in its entirety with respect to claims brought by Plaintiff P.W. and the putative Minor Subclass.

//

---

[12] This is true even if Virginia law applied. *See Boy Blue*, 74 Va. Cir. at *5 (citing *Mustard v. Wohlford's Heirs*, 56 Va. 329, 329 (1859)).

Respectfully Submitted,

DATED: July 21, 2022                    **KRONENBERGER ROSENFELD, LLP**


By:  /s/ Karl Kronenberger_____
                          Karl S. Kronenberger
               Katherine E. Hollist (admitted *pro hac vice*)


**POLLOCK COHEN LLP**
Raphael Janove (he/him/his)
rafi@pollockcohen.com
Adam Pollock (he/him/his)
adam@pollockcohen.com
111 Broadway, Suite 1804
New York, NY 10006
Telephone: (212) 337-5361

**JAY KUMAR LAW**
Jay Kumar (admitted *pro hac vice*) (he/him/his)
jay@jaykumarlaw.com
73 W. Monroe Street, Suite 100
Chicago, IL 60603
Telephone: (312) 767-7903

*Attorneys for Plaintiffs Charissa Keebaugh, Stephanie Neveu, Heather Mercieri, Sophia Nicholson, and P.W.*