**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CHARISSA KEEBAUGH; STEPHANIE NEVEU; HEATHER MERCIERI; SOPHIA NICHOLSON; P.W., by and through his Guardian JOIE WEIHER; on behalf of themselves and all others similarly situated, | No. 22-55982<br><br>D.C. No.<br>2:22-cv-01272-<br>MEMF-AGR |
| *Plaintiffs-Appellees*, | |
| v. | OPINION |
| WARNER BROS. ENTERTAINMENT INC., a Delaware corporation, | |
| *Defendant-Appellant*. | |

Appeal from the United States District Court
for the Central District of California
Maame Ewusi-Mensah Frimpong, District Judge, Presiding

Argued and Submitted January 12, 2024
Pasadena, California

Filed April 26, 2024

Before:  Richard C. Tallman and Mark J. Bennett, Circuit Judges, and Robert S. Lasnik,[*] District Judge.

Opinion by Judge Bennett

## SUMMARY[**]

### Arbitration

The panel reversed the district court's order denying Warner Bros. Entertainment Inc.'s motion to compel arbitration pursuant to the Terms of Service in a mobile application *Game of Thrones: Conquest* ("GOTC").

Plaintiffs filed a putative class action against Warner Bros. alleging false and misleading advertising within GOTC.  Warner Bros. moved to compel arbitration of all claims, which the district court denied because Warner Bros. failed to provide reasonably conspicuous notice of its Terms of Service.

The GOTC has a "sign-in wrap agreement" where users are required to advance through a sign-in screen which states "By tapping 'Play,' I agree to the Terms of Service."  Under California law, a sign-in wrap agreement may be an enforceable contract based on inquiry notice if the website provides reasonably conspicuous notice of the terms, and the

---

[*] The Honorable Robert S. Lasnik, United States District Judge for the Western District of Washington, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

consumer takes some action that unambiguously manifests assent to those terms. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849 (9th Cir. 2022).

The panel held that the district court erred in finding that Warner Bros. failed to provide reasonably conspicuous notice. The district court focused almost exclusively on whether the context of the transaction put Plaintiffs on notice that they were agreeing to the Terms of Service. To the extent that the district court treated this factor as dispositive, that holding was erroneous. A court must look to both "the context of the transaction" and the "placement of the notice" when conducting a *Berman* review. Warner Bros. succeeded on both counts. The GOTC satisfied the context-of-the-transaction test from *Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 15 (Cal. Ct. App. 2021), and the notice was conspicuous and put the reasonable user on notice that they were agreeing to be bound by the Terms of Service.

The panel rejected Plaintiffs' argument that the arbitration agreement was rendered unconscionable by its ban on public injunctive relief. The panel held that the Terms of Service impermissibly foreclosed the opportunity to seek public injunctive relief in any forum, and this provision thus violated the *McGill* rule and was unenforceable in California. But unenforceable is not the same as unconscionable. The panel concluded that the unenforceability of the waiver of one's right to seek public injunctive relief did not make either this provision or by extension the arbitration agreement unconscionable or otherwise unenforceable.

## COUNSEL

Raphael Janove (argued), Janove PLLC, New York, New York; Karl S. Kronenberger, Kronenberger Rosenfeld LLP, San Francisco, California; Alison Borochoff-Porte and Adam Pollock, Pollock Cohen LLP, New York, New York; Jay Kumar, Jay Kumar Law, Chicago, Illinois; Liana R. Vitale, San Luis Obispo, California; for Plaintiffs-Appellees.

Christopher Chorba (argued), Jeremy S. Smith, Patrick J. Fuster, and Adrienne M. Liu, Gibson Dunn & Crutcher LLP, Los Angeles, California, for Defendant-Appellant.

Glenn A. Danas and Katelyn M. Leeviraphan, Clarkson Law Firm PC, Malibu, California; for Amici Curiae Dr. Colin Gray, Dr. Woodrow Hartzog, J,D., and Johanna Gunawan, M.S..

## OPINION

BENNETT, Circuit Judge:

Plaintiffs are a group of individuals, including a minor, who filed a putative class action against Defendant Warner Bros. Entertainment, Inc ("Warner Bros.") for its alleged misrepresentations related to the mobile application ("app"), *Game of Thrones: Conquest* ("GOTC"). Warner Bros. moved to compel arbitration pursuant to the GOTC Terms of Service, which users agree to by tapping a "Play" button located on the app's sign-in screen. The district court found the notice of the Terms of Service was insufficiently conspicuous to bind users to them, and accordingly denied Warner Bros.' motion to compel arbitration. Warner Bros. now appeals, asserting that the district court's determination was erroneous. We agree and reverse and remand. We also address one other issue fully briefed by the parties: whether the arbitration agreement's bar on public injunctive relief renders the agreement and/or its arbitration provision substantively unconscionable or otherwise unenforceable. We hold that it does not.

## Background

Users can download GOTC through the Apple App Store or Google Play Store. GOTC involves developing a castle, raising dragons, and defending against invasions by other players. Players can expedite their game progression by purchasing in-app resources, such as gold, building materials, and dragon food. When opening the app for the first time, users see a starting screen. While the background artwork has varied, GOTC has historically used one of the following sign-in screen layouts:

6      Keebaugh v. Warner Bros. Entertainment Inc.



2019 Version



2020 Version

The 2019 Version appeared until December 2019 and was then replaced by the 2020 Version.[1]  Below the Play button, the app informs users that by pressing the Play button, they agree to the Terms of Service (also known as Terms of Use depending on the app version). Below this are two distinct interactable boxes—one, labeled "Privacy Policy," which hyperlinks players to a separate "Privacy Policy" when pressed, and the second, labeled "Terms of Service," which hyperlinks players to the full text of the Terms of Service when pressed.  Users cannot access the game until they press the Play button.  But, users do not have to individually view or accept the Privacy Policy or Terms of Service before pressing Play.

The first paragraph of the Terms of Service for the 2019 Version reads:

> PLEASE READ THESE TERMS OF USE ("Terms," "Terms of Use," or "Agreement") CAREFULLY—THEY AFFECT YOUR LEGAL RIGHTS AND OBLIGATIONS, AND INCLUDE WAIVERS OF RIGHTS, LIMITATIONS OF LIABILITY, AND YOUR INDEMNITY TO US. THESE TERMS ALSO REQUIRE THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES,

---

[1] The sign-in screen has since changed, but this dispute arises solely from action taken under either the 2019 Version or the 2020 Version.

WAIVING YOUR RIGHT TO A JURY TRIAL AND CLASS ACTION RELIEF.

Paragraph 16 of the 2019 Terms of Service explains the arbitration agreement:

> With the exception of class actions, small claims court filings, or actions for preliminary injunctive relief (as further discussed below), any other dispute of any kind between you and Warner arising under this Agreement or in connection with your use of the Service ("Dispute(s)"), if unresolved through the informal process outlined above, will be resolved by binding arbitration . . . .

The 2019 Terms of Service also contain a Class Action Waiver in which the user and Warner Bros. agree that "disputes will be resolved on an individual basis and that any claims brought under these terms of use or in connection with the service must be brought in the parties' individual capacities, and not as a plaintiff or class member in any putative class, collective, or representative proceeding." The 2020 Terms of Service contain similar provisions.

In February 2022, Plaintiffs Charissa Keebaugh, Stephanie Neveu, and Heather Mercieri filed a putative class action against Warner Bros. alleging false and misleading advertising within GOTC. In May 2022, the original Plaintiffs and new Plaintiffs Sophia Nicholson and P.W., who is a minor, filed the First Amended Complaint. Plaintiffs allege nine causes of action including fraud, negligent misrepresentation, declaratory judgment, and

violations of: (1) California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; (2) California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*; (3) California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; (4) New Hampshire's Regulation of Business Practices for Consumer Protection Act; (5) Washington's Consumer Protection Act, Wash. Rev. Code § 19.86.020; and (6) N.Y. Gen. Bus. Law §§ 349, 350.

Warner Bros. moved to compel arbitration of all claims pursuant to the GOTC Terms of Service. The district court denied the motion, concluding that "[a] valid arbitration agreement does not exist between the parties" because Warner Bros. had failed to provide reasonably conspicuous notice of its Terms of Service. *Keebaugh v. Warner Bros. Ent. Inc.*, No. 2:22-cv-01272-MEMF (AGR), 2022 WL 7610032, at *5 (C.D. Cal. Oct. 13, 2022). Warner Bros. timely appealed.

Warner Bros. argues the district court erred in its denial of their motion to compel arbitration as there was conspicuous notice and the district court failed to apply recent and controlling Ninth Circuit precedent in making its "no conspicuous notice" determination. Plaintiffs respond that the district court correctly applied California law for evaluating conspicuous notice and that Plaintiffs did not unambiguously manifest consent to be bound by the Terms of Service. Plaintiffs also argue that even if the district court erred, we should still affirm the denial of the motion to compel arbitration because the terms are unconscionable. Plaintiffs also ask us to find that the minor plaintiff may disaffirm the agreement, and that any claims for public injunctive relief should be determined by the district court and not in arbitration.

We find that because the notice provided by Warner Bros. is sufficiently conspicuous, a valid arbitration agreement exists between Warner Bros. and the non-minor Plaintiffs.[2] We decline to address Plaintiffs' arguments regarding the minor Plaintiff's ability to disaffirm the agreement and their arguments relating to unconscionability. But we reach and reject Plaintiffs' claims that the arbitration agreement's bar on public injunctive relief renders the agreement and/or its arbitration provision substantively unconscionable or otherwise unenforceable. Thus, we reverse and remand this matter for further proceedings.

---

[2] We leave Plaintiffs' additional claims to the district court to decide in the first instance. We also leave to the district court any determination of whether Plaintiffs can raise new arguments related to the arbitration agreement or whether they are limited to the arguments already raised. We note, however, that while "courts may resolve challenges directed specifically to the validity of the arbitration provision itself," if that challenge fails, "the court must send to the arbitrator any other challenges, including challenges to the validity of the contract as a whole." *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1029 (9th Cir. 2022) (quotations omitted). This is particularly true when, as here, the arbitration provision delegates to the arbitrator gateway questions of arbitrability, such as whether the agreement covers the claim at issue or whether the arbitration provision is enforceable. *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010). "Under *Rent-A-Center*, a valid—*i.e.*, enforceable—delegation clause commits to the arbitrator nearly all challenges to an arbitration provision." *Caremark*, 43 F.4th at 1029. We recently recognized that "[c]ourts have found that parties clearly delegated arbitrability where they incorporated an arbitrator's arbitration rules in the agreement." *Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 480 (9th Cir. 2024). The arbitration agreement here expressly incorporates the Consumer Arbitration Rules of the American Arbitration Association. The court in *Patrick* held that the "[i]ncorporation of the [AAA] arbitration rules constitutes clear and unmistakable evidence that the parties agree to arbitrate arbitrability." *Id.* at 481.

## Jurisdiction & Standards of Review

We have jurisdiction under 9 U.S.C. § 16(a)(1)(B).  The Federal Arbitration Act ("FAA") requires us to compel arbitration of claims covered by an enforceable arbitration agreement.  9 U.S.C. § 3.  "In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022) (citing *First Options of Chi. Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

The party seeking to compel arbitration "bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Johnson v. Walmart Inc.*, 57 F.4th 677, 681 (9th Cir. 2023).  If the court finds a valid arbitration agreement exists, "the court must order the parties to proceed to arbitration in accordance with the terms of the agreement." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 510 (9th Cir. 2023).  "We review de novo a district court's decision to . . . deny a motion to compel arbitration." *Holley-Gallegly v. TA Operating, LLC*, 74 F.4th 997, 1000 (9th Cir. 2023).

## Discussion

### I.  The district court erred in finding that Warner Bros. failed to provide reasonably conspicuous notice.

To form a contract under California law, there "must be actual or constructive notice of the agreement and the parties must manifest mutual assent."[3] *Oberstein*, 60 F.4th at 512–

---

[3] The district court applied California law to evaluate whether a valid agreement existed between the parties. *Keebaugh*, 2022 WL 7610032,

13.  Parties may manifest assent through their conduct, "[h]owever, '[t]he conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." *Berman*, 30 F.4th at 855 (second alteration in original) (quoting Restatement (Second) of Contracts § 19(2) (1981)).

In California, internet contracts are classified "by the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps." *Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 15 (Cal. Ct. App. 2021).  The first, a browsewrap agreement, is "one in which an internet user accepts a website's terms of use merely by browsing the site."  *Id.*  Courts have consistently held this type of agreement to be unenforceable, as individuals do not have inquiry notice.  *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1178–79 (9th Cir. 2014).

The second form, a clickwrap agreement, requires users to click on an "I agree" box after being presented with a list of terms and conditions of use.  *See id.* at 15, 20–21.  Courts have "routinely found clickwrap agreements enforceable." *Berman*, 30 F.4th at 856 (citing *Meyer v. Uber Techs. Inc.*, 868 F.3d 66, 75 (2d Cir. 2017)).  The agreement with the strongest notice is the scrollwrap agreement, where the user must scroll through all the Terms of Service before they can click the mandatory "I agree" box.  *Sellers*, 289 Cal. Rptr. 3d at 15.

---

at *4–5.  Neither party has argued that the application of any other law is appropriate to determine contract formation or that the district court erred in applying California law.  Because the parties agree, we evaluate the existence of an agreement between them under California law.

While GOTC requires individual users to press a "Play" button before they can access the game, it does not require users to review the Terms of Service and confirm their assent prior to accessing the game as would be the case with a scrollwrap or clickwrap agreement. Instead, users are required to advance through a sign-in screen which states "By tapping 'Play,' I agree to the Terms of Service." Therefore, this is a sign-in wrap agreement. *See id.*

Under California law, a sign-in wrap agreement may be an enforceable contract based on inquiry notice if "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman*, 30 F.4th at 856 (applying identical New York and California law as both dictated the same outcome). To be conspicuous, notice "must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Id.* While terms may be disclosed through hyperlinks, the presence of a hyperlink "must be readily apparent," and "[s]imply underscoring words or phrases . . . will often be insufficient to alert a reasonably prudent user that a clickable link exists." *Id.* at 857 (citing *Sellers*, 289 Cal. Rptr. at 29).

The district court held there was no mutual assent because Warner Bros. "failed to meet its burden to establish that it provided reasonably conspicuous notice of the [Terms of Service] on its Opening Screen." *Keebaugh*, 2022 WL 7610032, at *7. While the district court recognized that "several federal district courts have focused on factors such as font size and graphic layout to determine whether a user would be on inquiry notice . . . . the *Sellers* Court observed that the consideration of such subjective criteria, alone, has

led to inconsistent decisions." *Id.* at *6. Rather than analyzing the visual aspects of the notice, the district court focused almost exclusively on "the context of the transaction between Warner Bros. and GOTC players," and concluded that, because the user did not contemplate "some sort of continuing relationship . . . that would require some terms and conditions," notice was insufficient. *Id.* (ellipsis in original) (internal quotation omitted).

Neither party disputes any facts related to the notice—only whether the district court correctly applied existing law to evaluate the conspicuousness of Warner Bros.' notice. "[W]here the authenticity of screenshots is not subject to factual dispute, courts may decide the issue [of constructive notice] as a pure question of law." *Oberstein*, 60 F.4th at 518 (internal quotation marks omitted).

a.   Evolution of Conspicuous Notice Precedent

In *Nguyen*, we articulated a bright-line rule for browsewrap agreements:

> where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more—is insufficient to give rise to constructive notice.

763 F.3d at 1178–79

Two years later, the California Court of Appeal affirmed the denial of a petition to compel arbitration on the grounds

that the Terms of Use were "too inconspicuous to impose constructive knowledge" on the plaintiffs. *Long v. Provide Com., Inc.*, 200 Cal. Rptr. 3d 117, 120 (Cal. Ct. App. 2016).[4] Citing *Nguyen*, the *Long* court rejected the website provider's argument that the hyperlink was sufficiently conspicuous to put a reasonable user on notice because it was "immediately visible on the checkout flow, viewable without scrolling, and located next to several fields that the website user [was] required to fill out and the buttons he must click to complete an order." *Id.* at 125. The *Long* court found that "merely displaying a hyperlink in a prominent or conspicuous place . . . without notifying consumers that the linked page contains binding contractual terms" may dilute the phrase "terms of use" to "have no meaning or a different meaning to a large segment of the Internet-using public." *Id.* at 126–27.

No California appellate court had directly addressed the validity of sign-in wrap agreements until *Sellers*, 289 Cal. Rptr. 3d 1. The website at issue in *Sellers*, JustAnswers, allowed users to ask questions directly to trained professionals, such as doctors, lawyers, or veterinarians. *Id.* at 5–6. In small print, the website provided "Unlimited conversations with doctors—try 7 days for just $5. Then

---

[4] The California Supreme Court has not addressed the formation of online agreements. "[A] federal court sitting in diversity must follow an intermediate state court decision unless other persuasive authority convinces the federal court that the state supreme court would decide otherwise." *Richardson v. United States*, 841 F.2d 993, 996 (9th Cir. 1988) (citing *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223 (1940)). Neither party has suggested the relevant California Courts of Appeal decisions are wrong, rather they disagree as to their meaning. Neither party asks us to do more than follow and apply the relevant decisions from the Courts of Appeal. Those decisions, as well as existing Ninth Circuit precedent applying those decisions, are controlling.

$46/month. Cancel anytime." *Id.* at 7. Below that text appeared a white box in which users could enter their credit card information and email address. *Id.* Finally, below that box, "in very small print," there was an advisement that "[b]y clicking 'Start my trial' you indicate that you agree to the terms of service and are 13+ years old." *Id.* The phrase "terms of service" was hyperlinked to another webpage with 26 pages of terms, including a binding arbitration clause and a class action waiver. *Id.*

Plaintiffs filed a class action lawsuit claiming that JustAnswer violated California's Automatic Renewal Law (ARL), which "makes it unlawful for a business to enroll a customer in an automatic renewal or continuous service agreement without presenting the service terms to the customer in a 'clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity . . . to the request for consent to the offer.'" *Id.* at 11 (quoting Cal. Bus. & Prof. Code § 17602(a)(1)). The ARL defines "clear and conspicuous" to mean "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." Cal. Bus. & Prof. Code § 17601(c).

The *Sellers* court declined to compel arbitration because the "textual notices on the JustAnswer website were insufficiently conspicuous to bind plaintiffs to the terms of service. *Sellers*, 289 Cal. Rptr. 3d at 31–32 (emphasis added). The court explained "the existence of a contract turns on whether a reasonably prudent offeree would be on inquiry notice of the terms at issue." *Id.* at 21 (internal quotations omitted). To determine whether notice is sufficient under the ARL for sign-in wrap agreements, "the

full context of the transaction is critical," because transactions in which "a consumer [is] signing up for an ongoing account," makes it "reasonable to expect that the typical consumer in that type of transaction contemplates entering into a continuing, forward-looking relationship." *Id.* at 22, 26. The court noted that unless the user was particularly savvy, it was unlikely they would recognize the notice statement, which appeared "in extremely small print, outside the white box containing the payment fields where the consumer's attention would necessarily be focused," and, although the terms were hyperlinked and underlined, they were not "set apart in any other way that may draw the attention of the consumer, such as with blue text or capital letters." *Id.* at 29 (footnote omitted).

The California Court of Appeal clarified the extent of *Sellers* in *B.D. v. Blizzard Entertainment, Inc.*, 292 Cal. Rptr. 3d 47 (Cal. Ct. App. 2022). There, a minor and his father sued a video game developer alleging violations of California's Unfair Competition Law. *Id.* at 51. The developer moved to compel arbitration based on various iterations of its online End User License Agreement ("EULA"). *Id.* at 52. The EULA was presented to users "in an online pop-up window that contained the entire agreement within a scrollable text box" and informed users that they "may not use Blizzard's service if they do not agree to all of the terms in the license agreement," and they "should read the section of the license agreement 'below' titled 'dispute resolution' because it contains an arbitration agreement and class action waiver that affect users' legal rights." *Id.* at 52–53.

Finding the EULA constituted a sign-in wrap agreement, the court reversed the denial of Blizzard's motion to compel arbitration. *Id.* at 71. The court noted the first step was to

evaluate "the full context of the transaction." *Id.* at 64 (quoting *Sellers*, 289 Cal. Rptr. 3d at 26). The minor, B.D., "purchased Loot Boxes for $10 in a game he had previously purchased for $40," and "accessed Blizzard's online platform to interact with other players in a videogame . . . he spent approximately 50 hours playing . . . over the course of approximately two years." *Id.* (second ellipses in original) (internal quotations omitted). Those circumstances made it reasonable to expect that the typical consumer "in that type of transaction contemplates entering into a continuing, forward-looking relationship." *Id.* (quoting *Sellers*, 289 Cal. Rptr. 3d at 22).

Blizzard's notice did "not suffer from the same infirmities as the notice provided by the defendant in *Sellers*," and, unlike in *Sellers*, "Blizzard's notice [was] not subject to the ARL's *specific conspicuousness criteria*." *Id.* at 67 (emphasis added). Blizzard's notice was "not in extremely small print, lacking contrast, or outside the area where the consumer's attention would necessarily be focused," and it "did not rely on a visually nondescript hyperlink." *Id.* (internal quotations, alterations, and citations omitted).

As explained in *Blizzard*, when evaluating sign-in wrap agreements, *Sellers* requires courts to "first evaluate 'the full context of the transaction,'" and consider whether "'that type of transaction contemplates entering into a continuing, forward-looking relationship' governed by terms and conditions." *Id.* at 64 (quoting *Sellers*, 289 Cal. Rptr. 3d at 22, 26).

We have decided two cases regarding online contracts since *Blizzard*. In *Berman*, we evaluated two websites and determined the website provider's notice was insufficiently

conspicuous to bind a consumer to the hyperlinked terms and conditions on each.  30 F.4th at 856–57.  The first website had large orange letters across the top of the page welcoming back the user who had visited the page.  *Id.* at 853. Additionally:

> In the middle of the screen, the webpage proclaimed, "Getting Free Stuff Has Never Been Easier!" and included brightly colored graphics.  In between those two lines of text appeared a box that stated at the top, "Confirm your ZIP Code Below," followed immediately by a pre-populated text box displaying the zip code 93930.  Below that, the page displayed a large green button inviting [the user] to confirm the accuracy of the zip code so that she could proceed to the next page in the website flow.  The text inside the button stated, in easy-to-read white letters, "This is correct, Continue!  >>."  Clicking on this button led to the next page, which asked [the user] to provide personal information in order to obtain free product samples and promotional deals.
>
> Between the comparatively large box displaying the zip code and the large green "continue" button were two lines of text in a tiny gray font, which stated: "I understand and agree to the Terms & Conditions which includes mandatory arbitration and Privacy Policy."  The underlined phrases "Terms & Conditions" and "Privacy Policy" were hyperlinks, but they appeared in the same gray font as the rest of the sentence, rather

than in blue, the color typically used to signify the presence of a hyperlink.

*Id.* at 853–54.

The second website

> stated at the top, "Shipping Information Required," and below that, "Complete your shipping information to continue towards your reward." What followed were several fields requiring [the user] to input her name, address, telephone number, and date of birth. Below a line instructing the user to "Select Gender," two buttons appeared side by side marked "Male" and "Female." Below that was a large green button with text that stated, in easy-to-read white letters, "Continue >>." [The user] had to click on the "continue" button to proceed to the next page in the website flow.
>
> As with the [first website,] sandwiched between the buttons allowing Russell to select her gender and the large green "continue" button were the same two lines of text in tiny gray font stating, "I understand and agree to the Terms & Conditions which includes mandatory arbitration and Privacy Policy." The hyperlinks were underlined but again appeared in the same gray font as the rest of the sentence.

*Id.* at 854 (citation omitted). In evaluating the websites, we articulated a two-part test and held that, absent a showing of

actual knowledge, an enforceable online agreement based on inquiry notice may be found only if: "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.* at 856.

Then, in *Oberstein*, we affirmed compelled arbitration when a website "[a]t three independent stages—when creating an account, signing into an account, and completing a purchase—. . . presented [users] with a confirmation button above which text informs the user that, by clicking on this button, 'you agree to our Terms of Use.'" 60 F.4th at 515. We "analyze[d] mutual assent under an objective-reasonableness standard." *Id.* at 513 (citing *Berman*, 30 F.4th at 856–58) (explaining that the court in *Berman* was "conducting a fact-intensive inquiry to determine whether a non-clickwrap agreement met an objective standard of mutual assent"). Because users were presented with the phrase "you agree to our Terms of Use" three times, the Terms of Use were hyperlinked and written in a bright blue font, that distinguished them from the surrounding text, and the text was in close proximity to the operative buttons the users needed to press to advance throughout the website, we found the notice was reasonably conspicuous. *Id.* at 515–16.

   b.  <u>The district court erred both in failing to address the visual elements of GOTC's sign-in screen and in finding a lack of an ongoing relationship.</u>

The district court focused almost exclusively on whether "the context of the transaction" put the Plaintiffs on notice that they were agreeing to the Terms of Service. *Keebaugh*, 2022 WL 7610032, at *6. The district court explained it

must "consider whether the Opening Screen provided notice in the context of the transaction between Warner Bros. and GOTC players," including whether the "registration process clearly contemplated some sort of continuing relationship." *Id.* (internal quotations omitted).  Because users could play GOTC without first creating an account, the district court concluded the app did not involve the "sort of continuing relationship . . . that would require some terms and conditions."  *Id.* (internal quotations omitted).  The district court distinguished *Blizzard* because GOTC users "did not have to create an account *with Warner Bros.*"  *Id.* at *7. Warner Bros. argues on appeal that the district court erred in finding *Sellers* required a formal sign-up process, and the "foremost" consideration in *Sellers* was the "clear and conspicuous notice" requirement of the ARL, which is inapplicable here.[5]  We agree.

In *Oberstein*, we explained that *Sellers* considered both "the context of the transaction and the placement of the notice," 60 F.4th at 516 (internal quotations omitted), and *Blizzard* clarified that "the transactional context is an important factor to consider and is key to determining the expectations of a typical consumer," 292 Cal. Rptr. 3d at 61 (internal quotations omitted).  Therefore, the context of the transaction is a non-dispositive factor under California law, used to evaluate whether a website's notice is sufficiently conspicuous.  Courts must still evaluate the visual aspects of the notice under the two-part test we articulated in *Berman*. *See Oberstein*, 60 F.4th at 516; *Patrick*, 93 F.4th at 477.

---

[5] Although they use similar language, the "clear and conspicuous notice" requirement of California's ARL is different and distinct from the requirement that sign-in wrap agreements provide "reasonably conspicuous notice of the terms."  *Berman*, 30 F.4th at 856.

The context-of-the-transaction test in *Sellers* was required in evaluating a claim under California's ARL, because "the Legislature has acknowledged that consumers are often enrolled in automatic renewal membership programs without their knowledge or consent, and has therefore set forth *specifically defined statutory notice requirements* pertaining to the enrollment of consumers in such programs." *Sellers*, 289 Cal. Rptr. 3d at 26 (emphasis added). The *Sellers* court then focused its context analysis under the heading that the textual notice of contractual terms that limit "the Consumer's Ability to Address Alleged ARL Violations Must Be Considered in the Context of the ARL." *Id.* But Plaintiffs have not brought a claim under the ARL against Warner Bros.

"First and foremost, the *Sellers* court found that in the context of a transaction governed by the ARL, the sign-in wrap notices 'were not sufficiently conspicuous to bind' the plaintiffs because the notices were 'significantly less conspicuous than the statutory notice requirements governing [the plaintiffs'] underlying [ARL] claims.'" *Blizzard*, 292 Cal. Rptr. 3d at 62 (alterations in original) (internal citations omitted). *Sellers*'s focus on the transactional context is "an important *factor* to consider and is key to determining the expectations of a typical consumer." *Id.* at 61 (emphasis added) (internal quotation omitted). To the extent the district court treated this factor as dispositive, that holding was erroneous.

The two cases decided by this court after *Sellers* both grouped context together with the traditional inquiry related to the visuals involved with the notice, such as font size, text placement, and overall screen design. In *Berman*, our contextual analysis was limited to only the visual elements. 30 F.4th at 856 ("First, to be conspicuous in this context, a

notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it."). In *Oberstein*, we first analyzed the visual elements and separately advised that "in contrast with the noncommittal free trial offered in *Sellers*, the context of this transaction, requiring a full registration process, reflected the contemplation of some sort of continuing relationship that would have put users on notice for a link to the terms of that continuing relationship." 60 F.4th at 517 (internal quotation omitted).

### c. GOTC provides reasonably conspicuous notice.

As explained above, we must look to both "the context of the transaction" and the "placement of the notice" when conducting review under *Berman*. Here, Warner Bros. succeeds on both accounts.

### i. The context of the transaction is sufficient.

Unlike *Blizzard*, users of GOTC neither purchase the game in the first instance, nor do they have to sign up for an account with Warner Bros. before playing GOTC. But users are notified prior to downloading the game that the app offers in-app purchases, and playing a mobile game with potentially unlimited in-app purchases is unlike buying two tablet devices (*Nguyen*), purchasing a single flower arrangement (*Long*), or signing up for a $5 trial (*Sellers*). There is no time limit imposed by Warner Bros. on how long the user may access the game.

The nature of downloading a mobile game to one's phone is different than simply accessing a website. When downloading an app to one's own device, the prudent internet user necessarily anticipates ongoing access to that app at the user's discretion—at least until the user deletes the

app, conditions imposed on the use of the app change, or the user decides to simply stop playing the game. An app is different from a typical one-and-done interaction between the user and a traditional website—the app's presence on the phone until deleted carries the connotation that the user will also have ongoing access to that app unless something material changes. And that would seem to be of even greater force as to a game app, where the entire point of the download is to have continued access to play the game.

For that reason, smartphone users need not establish an account with each individual app for the context to reflect an ongoing relationship. No reasonably prudent internet user—one who is likely often exposed to similar online agreements—would consider downloading and playing a potentially endless mobile game to be equivalent to an insular and discrete one-time transaction. These users know that, like many games on the various app stores, GOTC players can continue to play for a long time.

Users are also made aware via the download screen on the various app marketplaces that GOTC contains in-app purchases, and the users would understand that their use of an app that allows for in-app purchases would be governed by some terms of use. As in *Blizzard* where the continuing relationship was based on purchasing the $40 game and spending $10 on in-game purchases, 292 Cal. Rptr. 3d at 64, GOTC allows users to purchase in-app advantages and time-saving resources to utilize in the game. Users who download a game without a trial period, and especially those who intend to spend money within the game as in *Blizzard*, likely expect (and reasonable prudent users should expect) their access to the game to be continual. Thus, GOTC satisfies the context-of-the-transaction test from *Sellers*.

ii.      The visual placement of the notice is clear.

The sign-in screens for GOTC also satisfy the visual requirements to provide conspicuous notice that "a reasonably prudent Internet user would have seen." *Berman*, 30 F.4th at 856. Directly beneath the operative Play button is the following: "By tapping 'Play' I agree to the Terms of Service" or "By tapping 'Play' I accept the Terms of Use and acknowledge the Privacy Policy," depending on the app's version. The design elements use "a contrasting font color" making the notice legible on the dark background. *Id.* at 857. As in *Oberstein*, the notice here "is conspicuously displayed directly . . . below the action button," the statement "clearly denotes that continued use" will constitute acceptance of the Terms of Service, and the link to the Terms of Service "is conspicuously distinguished from the surrounding text," by a contrasting white font and emphasized through white borders outlining the hyperlinks. 60 F.4th at 516 (internal quotation omitted). Unlike the notices at issue in *Berman*, the sign-in screen here lacks clutter and uses "[c]ustomary design elements denoting the existence of a hyperlink." 30 F.4th at 857. The notice is conspicuous and puts the reasonable user on notice that they are agreeing to be bound by the Terms of Service.[6]

---

[6] Plaintiffs argue they did not unambiguously manifest their consent to be bound by the Terms of Service, because of a typographical error on the sign-in screen. The district court also took issue with the 2020 Version's usage of "Terms of Use" while linking to the "Terms of Service." *Keebaugh*, 2022 WL 7610032, at *7. But mutual assent is based on "the reasonable meaning" of the parties' words. *Long*, 200 Cal. Rptr. 3d at 122. "Reasonable meaning" considers "the context or the surrounding circumstances and the conduct of the parties." *H.S. Crocker Co. v. McFaddin*, 307 P.2d 429, 433 (Cal. Ct. App. 1957). Given the

## II.  Alleged unconscionability of the arbitration terms and P.W.'s ability to disaffirm.

Plaintiffs argue that if we were to reverse the district court's arbitration decision, we "should exercise [our] equitable discretion" to decide whether Plaintiffs must arbitrate their claims for public injunctive relief and whether the Warner Bros.' Terms of Service are unconscionable (including because the terms allegedly purport to require arbitration of public injunction claims).  Plaintiffs similarly argue we should decide whether P.W.'s claims can be arbitrated given his age.  These issues were all raised below, but the district court declined to reach them after finding no agreement existed between the parties.  Both parties briefed these issues on appeal.[7]  With one exception, we decline to

---

prevalence of Terms of Use and Terms of Service in modern society and the frequency they are presented to users, it is clear from the context what was meant by "Terms of Use" and the "obvious typographical error[]" clearly cannot be the basis for invalidating an agreement to arbitrate." *Viamontes v. Adriana's Ins. Servs., Inc.*, No. B253407, 2016 WL 826148, at *2 n.1 (Cal. Ct. App. Mar. 3, 2016); s*ee Emps. Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003) ("[W]e may consider unpublished state decisions, even though such opinions have no precedential value").

[7] At oral argument, both parties were asked whether we should address the remaining issues as pure legal questions or leave them to the district court to consider in the first instance.  Warner Bros.' counsel replied that "the more efficient way would be to remand and have the district court consider those [arguments] in the first instance."  Oral Arg. at 3:36–3:41. Counsel also noted that, as Plaintiffs have pointed out, "the Terms of Service have since changed since the 2018 Terms that were before this court, so that is one reason why we believe the more efficient course would be to remand, so that there would be a more fully developed record."  Oral Arg. at 3:55–4:07.  Plaintiffs partially reversed their original position and stated, "because of the change in the Terms of Use

reach these issues, and we leave them for the district court to address for the first time on remand.  We do choose to reach the claim regarding public injunctive relief, as it is likely to arise again, and it is "[a] purely legal issue . . . for which the factual record is so fully developed as to render any further development irrelevant."  *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1111 (9th Cir. 2020).

In part, Plaintiffs argue here that the Terms of Service are substantively unconscionable because the arbitration agreement contains a "purported ban on public injunctive relief" which they say violates California law and *McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017).  The Terms of Service restrict the available remedies an arbitrator may award to the scope "necessary to provide relief warranted by that party's individual claim."  As part of this restriction, the Terms of Service provide that the parties "may bring claims against the other only in your . . . individual capacity, and not as a plaintiff or class member in any purported class, representative, or private attorney general proceeding."  Put succinctly, the Terms of Service require disputes to go to arbitration, thus barring consideration of a public injunctive claim in court, while also limiting the arbitrator's ability to award remedies to only "that party's individual claim."

In California, contractual provisions waiving the right to seek public injunctive relief in any forum are unenforceable.  *McGill*, 393 P.3d at 87.  We have held that this *McGill* rule does not violate the FAA.  *Blair v. Rent-A-Ctr., Inc.*, 928 F.3d 819, 828–31 (9th Cir. 2019).  "Contracts permitting

---

during the appeal and we have some disputes about what they mean and whether they would apply to the class, as to the unconscionability issue, that would be appropriate for remand."  Oral Arg. at 9:56–10:08.

public injunctive relief in some fora but not others do not violate *McGill*." *Patrick*, 93 F.4th at 478. "To implicate *McGill*, the arbitration provision must also prohibit the arbitrator from awarding relief that would affect those other than plaintiff." *Id.* (internal quotations and alterations omitted). Given that Warner Bros.' Terms of Service require arbitration of all claims and limit the arbitrator's ability to award relief "only in favor of the individual party seeking relief," the Terms of Service impermissibly foreclose the opportunity to seek public injunctive relief in any forum. The provision thus violates the *McGill* rule and is unenforceable in California.

But unenforceable is not the same as unconscionable; even if it were, it would not necessarily require voiding the *entire* arbitration provision as unconscionable. Under California law, "the doctrine of unconscionability has both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results." *Baltazar v. Forever 21, Inc.*, 367 P.3d 6, 11 (Cal. 2016) (internal quotations omitted). They "must *both* be present in order for a court to exercise its discretion to refuse to enforce a contract or clause . . . [, b]ut they need not be present in the same degree." *Id.* (internal quotations omitted). Courts evaluate unconscionability along "a sliding scale" under which "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id.* (internal quotations omitted).

Although Plaintiffs argue the Terms of Service are procedurally unconscionable for various reasons, we leave that determination to the district court. As to the arbitration agreement's bar on public injunctive relief, Plaintiffs only

allege it renders the agreement substantively unconscionable. Courts in California have used various standards for determining when an agreement is substantively unconscionable such as where the agreement is "overly harsh," "unduly oppressive," "unreasonably favorable," or "shock[s] the conscience." *Sanchez v. Valencia Holding Co., LLC*, 353 P.3d 741, 748 (Cal. 2015) (internal quotations omitted). The "central idea" is that the "unconscionability doctrine is concerned not with a simple old-fashioned bad bargain, but with terms that are unreasonably favorable to the more powerful party." *Baltazar*, 367 P.3d at 11 (internal quotations and citations omitted).

No aspect of the individualized relief provision so "shocks the conscience" that it rises to the level of substantive unconscionability. Even though the individualized relief provision is invalid under *McGill*, the provision does not render the agreement unconscionable as it can still be applied to the waiver of other representative, collective, or class action claims. We addressed a similar issue in the context of a claim brought under California's Private Attorneys General Act (PAGA). *See Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1264 (9th Cir. 2017). The plaintiff had entered into an arbitration agreement with defendants for any claims arising out of her employment. *Id.* at 1257. The defendants moved to compel arbitration, which the district court denied after finding the arbitration agreement was substantively unconscionable. *Id.* at 1259. Like *McGill*'s holding with regards to arbitration agreements impermissibly prohibiting public injunctive relief, we recognized the same was true in California for employment contracts waiving representative claims. *Id.* at 1263–64.

But we ultimately rejected the claim that because the waiver portion was unenforceable, the agreement itself was unconscionable, explaining "[u]nder California law, contracts can be contrary to public policy but not unconscionable and vice versa." *Id.* at 1264 (internal quotations and alterations omitted). We held "the unenforceability of the waiver of a PAGA representative action does not make this provision substantively unconscionable." *Id.* This was true, because the Supreme Court had "suggested that arbitration agreements can generally waive collective, classwide, and representative claims." *Id.* (referring to *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336 (2011)). Even if the parties could not "lawfully agree to waive a PAGA representative action" under California law, "*Concepcion* weigh[ed] sharply against holding that the waiver of other representative, collective or class action claims, as provided [by the arbitration agreement], is unconscionable." *Id.*

Warner Bros.' terms present a nearly identical scenario. There is a portion of the Terms of Service, the individualized relief provision, which California courts have identified as unenforceable. California has deemed contractual provisions waiving the right to seek public injunctive relief "invalid and unenforceable." *McGill*, 393 P.3d at 93. But as in *Poublon*, the unenforceability of the waiver of one's right to seek public injunctive relief does not make either this provision or by extension the arbitration agreement unconscionable or otherwise unenforceable . [8]

_____

[8] We do not reach, and leave to the district court, Plaintiffs' unconscionability arguments unrelated to public injunction issues, as well as other arguments made on appeal that were not first addressed by

## Conclusion

Accordingly, we reverse the denial of Warner Bros.' motion to compel arbitration.  We also reject the Plaintiffs' argument that the arbitration agreement is rendered unconscionable by its ban on public injunctive relief.

**REVERSED AND REMANDED. [9]**

---

the district court.  We also leave to the district court any determination as to whether Plaintiffs can raise new arguments related to the arbitration agreement.

[9] We award Warner Bros. its costs on appeal.